**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:20-cv-01256

JANE DOE S.N.

  Plaintiff,

v.

DILLON COMPANIES, LLC, D/B/A KING SOOPERS.

Defendant.

---

**FIRST AMENDED COMPLAINT**

---

COMES NOW Plaintiff JANE DOE S.N., (the "Plaintiff"), by and through counsel, The Law Office of Steve Roberts, LLC and the Law Offices of John D. Halepaska, LLC, and pursuant to F.R.C.P. 15(a) files her First Amended Complaint against Defendant Dillon Companies, LLC, states and alleges as follows:

Plaintiff's counsel conferred with Defendant's counsel prior to the filing of this Amended Complaint, and all parties agree that by filing this Amended Complaint no additional defenses will be available to Defendant due to the naming convention of the Defendant as named herein differing from the naming convention for Defendant as named in the original Complaint

**PARTIES JURISDICTION & VENUE**

1.      The Plaintiff, JANE DOE S.N. a minor child, was at all times relevant to this Complaint was and continues to be a resident of the State of Colorado.

2.      The Defendant, Dillon Companies, LLC., (the "Defendant") at all times relevant to this Complaint, was and continues to be a foreign corporation with its principal offices at Hutchinson, Kansas.

3.      The Court has specific personal jurisdiction over Defendant pursuant to the Colorado's

1

long-arm statute, C.R.S. § 13-1-124(a) and (b)**.** Defendant has sufficient contact with the State of Colorado to satisfy due process.

4.      Defendant Dillon has multiple locations of its business within the County of Boulder, Colorado.

5.      Defendant Dillon, a foreign corporation, transacts business in Boulder, Colorado, owns and uses real property in Boulder, Colorado, and committed a tortious act in Colorado. C.R.S. § 13-1-124(a) and (b)**.**

6.      Plaintiff's claims are not barred by the exclusive remedy provision of the Workers' Compensation Act.

## GENERAL ALLEGATIONS

-   **Relationship Between the Parties**

7.      In January of 2017, the Plaintiff was hired by Defendant d/b/a King Soopers in the position of a front-end courtesy clerk at Defendant's King Soopers supermarket located at 9820 W. Belleview Ave., in Littleton, County of Jefferson, Colorado (the "Store"). In January 2017, Plaintiff was a 16-year-old minor child, 5'2" in height, and approximately 130 lbs. or less in weight.

8.      Defendant also employed S.C., Plaintiff's Aunt and legal guardian, at the Store during January 2017.

9.      Defendant also employed Joel David Gould ("Gould") as a front-end manager at the Store in January 2017. In January 2017, Gould was a 34-year-old adult male, 6'2" in height, and approximately 220 lbs. in weight

10.     Gould's responsibilities as manager of Defendant's the Store included weekly scheduling of the working days and shifts of subordinate employees. Gould is listed as "Management" on these weekly schedules. Defendant advertises the position of "Front-End Manager" to include a specific essential job function:"[m]anage the scheduling of Front-end associates to provide adequate department coverage."

11.     Gould knew and had a casual friendship with S.C. prior to January 2017 due to their employment at Defendant's Store. Gould was familiar with Plaintiff and her family because of this casual friendship with S.C.

12.     Gould first met Plaintiff prior to her employment at Defendant's Store through his attendance at casual social gatherings which took place at S.C.'s residence, where Plaintiff also lived. Gould drank alcohol with Plaintiff's uncle at these gatherings on multiple occasions. Plaintiff's initial impression of Gould was that he was a "good guy," friendly, and harmless.

13.     Plaintiff was unaware of the possibility that her impression of Gould could be a total misconception such that she was unaware Gould was in reality a violent, deviant, and deceptive sexual predator.

- **Gould's abuse of power as manager to intentionally harm plaintiff through scheduling**

14.     Defendant, as a corporation, acts through "managers" who control corporate actions and operations.

15.     Gould, acting in the course and scope of his employment as a manager, created vital and necessary work schedules for front-end employees. The work schedules Gould created were for the benefit of Defendant. Through scheduling employees, Gould created and acted upon opportunities to intentionally harm Plaintiff S.N.

16.     Toward the end of the summer of 2017, Gould's behavior towards Plaintiff S.N. changed substantially during her shifts at the Store. Gould began exhibiting inappropriate behavior that caused Plaintiff to be uncomfortable. This included, without limitation: Gould standing uncomfortably close behind Plaintiff; brushing his body against Plaintiff; "cat calling" at Plaintiff; and, verbally commenting on Plaintiff's physical appearance, hair, and clothing in an inappropriate manner. Gould also said things toward Plaintiff in a quiet tone of voice inaudible to Plaintiff and when Plaintiff asked Gould to repeat himself, he refused to restate his words and told Plaintiff it was "nothing." Further, Gould would often call for Plaintiff to come to the front of the Store if Plaintiff was working in another area.

17.     At or around the same time as Gould's behavior toward Plaintiff S.N. changed, Gould began to schedule Plaintiff and S.C. to work different shifts such that their working hours did not overlap. For instance, Gould scheduled S.C. to work morning shifts beginning as early as 6:30 a.m. or 7:00 a.m. and scheduled Plaintiff to work night shifts typically ending at 11:00 p.m.

18.     Gould frequently scheduled no other front-end courtesy clerk or front-end floor supervisor to work past 10:00 p.m. on days he scheduled Plaintiff to work as front-end courtesy clerk until 11:00 p.m. On days when Plaintiff was not scheduled to work, Gould routinely scheduled his own shifts to end before 11:00 p.m. That is, Gould scheduled his shifts to end at 11:00 p.m. *only* when he also scheduled Plaintiff's shifts to end at 11:00 p.m.

19.     Gould thus routinely used his authority as manager to create a one-hour window in which no other employee would be in the immediate vicinity of Plaintiff at the Store. Gould knew it was likely few customers would be present in the store during this late hour. Further, Gould would often insist that Plaintiff accompany him to his car in the parking lot during their final break while working their scheduled shifts.  These break sessions would further allow Gould to put Plaintiff under his control.  Gould would sit in the car and stare at Plaintiff without saying a word.  Plaintiff states she felt uncomfortable during these times but did not know what to do.  Gould thus used his authority as manager to create frequent opportunities to be alone with Plaintiff at the Store and to

engage in inappropriate interactions with Plaintiff during working hours without any witnesses.

20. Gould knew S.C. typically drove Plaintiff S.N. to and from the Store for Plaintiff's scheduled shifts. Gould further knew that scheduling the shifts of Plaintiff and S.C. at times which did not overlap would cause Plaintiff to be in need of alternative transportation to the Store. Gould then volunteered and insisted on personally driving Plaintiff to the Store for her scheduled shifts.

21. Gould also knew that scheduling Plaintiff S.N.'s shifts to end at 11:00 p.m. and S.C.'s shifts to begin at 6:30 a.m. or 7:00 a.m. would make it impractical for S.C. to drive Plaintiff home after Plaintiff's shifts. Gould thus used his authority as manager to schedule employee shifts in a manner that allowed him frequent opportunity to volunteer and insist on driving Plaintiff home after her shifts ended.

22. Defendant knew that Plaintiff S.N. shared the same residence as S.C. and that S.C. was Plaintiff's legal guardian. However, Defendant never questioned or investigated why Gould routinely scheduled S.C. and Plaintiff for shifts which would cause them to be unable to arrive at or leave the Store together. Defendant also never questioned or investigated why Gould routinely scheduled shifts such that he and Plaintiff would be the only employees working in the front end of the Store from 10:00 p.m. to 11:00 p.m.

- **Gould's initial rape of Plaintiff**

23. One evening on or around August 2017, Gould offered to drive Plaintiff S.N. home after her shift. During this ride, Plaintiff's attention focused on her smart phone. Plaintiff presumed Gould was driving her home and did not pay attention to the route Gould drove. It was dark outside due to the time Plaintiff's scheduled shift ended. During the ride, Plaintiff looked up to her surroundings when Gould's vehicle came to a stop. Plaintiff and realized Gould took a different route than he had in the past. Plaintiff realized she was unfamiliar with the location and did not know where Gould had taken her. Plaintiff felt that something was wrong because of the way Gould had been acting toward her at work.

24. Gould proceeded to order Plaintiff S.N. to exit the vehicle and follow him. Gould threatened Plaintiff and her family with violence if she did not comply with his orders. Plaintiff then followed Gould's orders because she was terrified by Gould's threats of violence, aggressive demeanor and unclear intentions. Plaintiff knew Gould had a volatile temper as she was previously warned of the same by S.C., who learned of Gould's temper through their employment at the Store.

25. Gould led Plaintiff to a park-type area. Gould proceeded to violently pull Plaintiff's pants and underwear down, force her to bend over, and forcefully penetrate her genitals with his penis. Gould violently and forcefully raped Plaintiff, causing her to bleed from her genitals. After Gould stopped penetrating Plaintiff, she was terrified, traumatized, and in extreme pain. Gould then threatened to hurt Plaintiff and harm and kill Plaintiff's family, including S.C. if Plaintiff told anyone about the rape. Plaintiff believed Gould's threats and became concerned for her family's safety more than her own.

26.     Plaintiff S.N. had never engaged in sexual intercourse prior to when Gould raped her. In fact, Plaintiff intended to abstain from sexual intercourse prior to marriage.

- **Gould's continued threats of violence, abuses of power, and rapes of Plaintiff**

27.     For approximately six months following this rape, Gould constantly terrorized Plaintiff S.N. with threats of violence as he engaged in repeated acts of sexual abuse. Gould repeatedly forced Plaintiff to suffer violent and nonconsensual sexual intercourse, sexual contact, and sexual harassment.  Plaintiff did not inform anyone of Gould's actions during this approximately six-month period due to her fear of Gould and his threats against her and her family.

28.     Gould continued to schedule the Plaintiff S.N. in such a fashion as to need a ride home. Gould continuously raped the Plaintiff during these months. Plaintiff came to know when she would be raped next by looking at the schedule. Plaintiff, knowing when she was going to be raped, began taking alcohol to work to drink at her last "break" before getting off work.  She did so because the alcohol made the rape less painful.

29.     Gould continued to perform his job—including scheduling employee shifts—for the benefit of the Defendant while simultaneously isolating Plaintiff, his victim.  Defendant derived a benefit from Gould's actions in that the schedules Gould created aimed to ensure adequate employee coverage in the front-end department at all times.

30.     During this time frame, Gould both took photographs of Plaintiff S.N.'s naked body and coerced Plaintiff to photograph and send him pictures of her naked body. Plaintiff was a minor child at all times and these photographs amount to child pornography.

31.     Plaintiff S.N. was unsure and conflicted about how to address Gould's unwanted, inappropriate, threatening and abusive behavior. On one hand, she knew Joel was older than her and his employment by Defendant in a trusted position of authority as Plaintiff's boss and manager caused her to feel compelled to listen to Gould and follow his instructions. On the other hand, Plaintiff knew Gould's actions were wrong and thus did not want to follow his instructions.

- **S.C.'s confrontation of Gould and Plaintiff's reporting of his behavior and actions**

32.     S.C., noting a distinct change in Plaintiff S.N., began complaining to the Store's management about her daughter's late nights.  S.C. initially believed that the Plaintiff's drastic appearance and behavioral changes were due to a lack of sleep, as Plaintiff often worked until 11:00 p.m. while beginning her junior year in high school.

33.     Despite S.C.'s attempts to have Plaintiff' S.N.'s work schedule changed, Gould continued to schedule the Plaintiff in a manner that allowed him to be alone with Plaintiff and victimize her.

34.     Gould at times became visibly angry when S.C. showed up to the Store to take Plaintiff

5

home after her shifts. On one occasion, Gould threw his cellphone down an aisle at the Store out of anger when S.C. arrived to take Plaintiff home.

35.   One night in particular, Gould brought Plaintiff S.N. home exceptionally late following her shift at the Store—approximately midnight or later.  S.C. was very concerned by Gould dropping Plaintiff off at this late hour because she knew Plaintiff's work schedule and the amount of time required to drive to her home from the Store.  S.C. confronted Gould about the issue via text messages and/or phone calls. Plaintiff does not know how Gould explained himself, but as suddenly as the sexual abuse started, after this incident, it stopped.  Also at this time, S.C. and Plaintiff's uncle ensured that the Plaintiff had a ride home from her shifts at the Store, and that she did not ride home with Gould.

36.   Over approximately the next five months, Gould would, from time to time, come to Plaintiff S.N.'s house to visit S.C. and Plaintiff's uncle.  Plaintiff was thereby often reminded about the consequences threatened by Gould should she ever tell anyone about his actions.  Plaintiff lived in constant fear of being hurt or killed; her family being hurt or killed; being raped again; and/or worse actions.

37.   Finally, Plaintiff S.N. could not bear the horrendous suffering any longer and tearfully confided in her sister.  Plaintiff's decision was largely due to her knowledge that Gould had been texting her aunt seeking to go out with her for drinks.  Knowing Gould as she unfortunately did, Plaintiff could not stay silent, believing that S.C. would be the next victim.

38.   In approximately late August 2018, in an act of great courage, Plaintiff S.N. finally informed her family of Gould's rapes and abuses of power as manager.

39.   On or about August 31, 2018, S.C. informed the Jefferson County Sheriff's Office of Gould's criminal activity–approximately one year after Plaintiff S.N. was raped for the first time.

- **Defendant's knowledge and/or disregard of Gould's behavior and actions**

40.   Gould's purposefully deviant scheduling, rides home and inappropriate behavior toward Plaintiff was known to others in management who declined to take any action.  The facts and circumstances evidencing Gould's impropriety were deliberately ignored by management including, without limitation, that Gould, a 34-year-old man, routinely scheduled Plaintiff to work until 11:00 p.m., scheduled his own shifts to end at 11:00 p.m. only on days when Plaintiff's shifts ended at the same time, scheduled other employees' shifts so that only he and Plaintiff were in the front end of the Store from 10:00 p.m. to 11:00 p.m., and routinely drove a 16-year-old minor child home late at night.

41.   Defendant knew or should have known that Gould had sexual relations with customers and/or employees of King Soopers for reasons including but not limited to the knowledge of the same by other managers employed by Defendant at the Store. It was known that Defendant engaged in sexual intercourse with a customer of the Store, and Defendant himself admitted the

6

same to the Jefferson County Sheriff Office.

42.     Defendant knew or should have known that Gould's behavior, words and actions toward Plaintiff at the Store were inappropriate—with Gould in a position Plaintiff's superior and an adult, and Plaintiff in a position as his subordinate and a minor child—for reasons including, but not limited to, the knowledge of other employees of Defendant such as Plaintiff's immediate supervisor Selina Valderez who, noticing that Gould frequently called Plaintiff in particular to the front of the store during her shifts, inquired of Plaintiff why Gould so behaved.

43.     Defendant knew or should have known that Plaintiff was fearful of Gould for reasons including but not limited to the knowledge of a manager employed by Defendant at the Store who witnessed Plaintiff hide in order to avoid Gould after she was informed that Gould would soon be in the same area of the Store as her.

44.     Defendant knew or should have known that Plaintiff was engaging in non-consensual sexual intercourse for reasons including, but not limited to, that Plaintiff informed her immediate supervisor—Defendant's employee—that Plaintiff needed to take a pregnancy test because she had an accident.

45.     Defendant knew or should have known that Gould was engaging in inappropriate behavior toward Plaintiff during the course of their employment at Defendant's store for reasons including, but not limited to, Gould routinely scheduling himself and Plaintiff to be the only employees in the front end of the store from 10:00 p.m. to 11:00 p.m. and Gould not scheduling himself to work until 11:00 p.m. on days when Plaintiff was not scheduled to not work.

   -   **Defendant's violation of its publicly stated policies and voluntary duties**

46.     Defendant publishes a "Business Ethics Policy" and makes this document available to the public.[1] This document includes "The Dillon Co. Policy Concerning Sexual Harassment And Other Forms of Harassment" (the "Sexual Harassment Policy").

47.     Plaintiff at no time during her employment with Defendant had been given, told about, or trained about any ethics or sexual harassment policy.

48.     The Sexual Harassment Policy states, in relevant part:

> The Dillon Co. is committed to a workplace free from unlawful discrimination, which includes sexual harassment and other forms of harassment because of one's race, color, religion, gender, national origin, age, disability, sexual orientation, or gender identity.

---

[1] **Exhibit 1,** The Dillon Co. Policy on Business Ethics, retrieved March 3, 2020, *available at* https://www.theDillonco.com/wp-content/uploads/2017/09/business-ethics-policy.pdf

> Any form of harassment undermines the company's insistence upon associate integrity, and is considered serious misconduct. No associate, either male or female, should be subjected to offensive conduct or innuendo, either verbal or physical, from co-workers, supervisors, customers or vendors.
>
> All associates have a responsibility to maintain the workplace free of harassment and to report such misconduct when it occurs, just as any form of unlawful discrimination should be reported.
>
> Proven sexual harassment, or harassment because of an individual's race, color, religion, gender, national origin, age, disability, sexual orientation, or gender identity**, will result in discipline up to and including discharge from employment**.
>
> Sexual harassment is defined as: **Unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct if** (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) **such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment**.
>
> Examples of sexual harassment include the following:
>
> - conditioning promotion, demotion, performance evaluations and the like upon submission to sexual favors;
> - touching that is unwanted, uninvited or offensive;
> - displaying sexually suggestive or explicit material, pictures or cartoons;
> - relating sexually suggestive or explicit stories or "jokes;" and
> - making sexually suggestive or explicit gestures.
>
> [. . .]
> All claims of harassment will be investigated promptly and will be handled professionally and as confidentially as circumstances permit. Your further participation in the investigation may be necessary, and you will be informed of the outcome.

*Id.* at 15-17 (emphasis added).

49. Defendant failed to follow the procedures outlined in the Sexual Harassment Policy. Defendant never investigated Gould's behavior, words and actions toward Plaintiff S.N. Defendant never checked on Plaintiff, never investigated why she was fearful of Gould, and never inquired into Plaintiff's wellbeing or safety. In fact, Defendant took no action aimed to obtain additional

information about Gould's relationship with Plaintiff in the workplace or outside of it.

50.  Upon receiving notice and/or complaints of Gould's scheduling and concerns related to his relationship with Plaintiff S.N.—which occurred close in time to when S.C. confronted Gould about brining Plaintiff home late—Defendant did not reprimand or discipline Gould, and did not seek to investigate this information further.

51.  On or about May 20, 2018, Defendant responded by reassigning Gould to a *different* King Soopers store in a similar position as manager. Defendant thereby deliberately, knowingly, recklessly and/or negligently endangered any number of additional young female employees.

52.  Defendant's actions in transferring Gould to another store without any demotion or other reprisal does not constitute the "discipline up to and including discharge from employment" contemplated by the Sexual Harassment Policy. Rather, Defendant's lack of any serious repercussions to Gould shows Defendant did not view or treat Gould's behavior as "serious misconduct," which Defendant proclaims any form of harassment to be in the Sexual Harassment Policy. *See* id.

- **Conspiracy to conceal Gould's behavior and actions Defendant's management and employees'**

53.  In transferring Gould to another store, Defendant acted to conceal Gould's actions toward Plaintiff including use of his scheduling duties as a manager to isolate Plaintiff S.N. during scheduled shifts in the Store and thereby create opportunities for him to sexually harass her, sequester her by insisting on driving her home, and rape her.

54.  On or about September 28, 2018, the Jefferson County Sheriff Office contacted Ken Heck, Defendant's manager of the Store via telephone to inquire about the transfer of Gould to a different King Soopers store. Heck stated that S.C. spoke to him about the situation involving Gould and Plaintiff prior to receiving the phone call. Heck stated that Gould was transferred because of performance issues including a poor demeanor with the employees he supervised. Heck claimed Gould was unfriendly and abrupt with employees. Heck claimed that Defendant's employee Chad Kennedy had observed this behavior.

55.  On or about October 4, 2018, Gould was arrested for the crimes of Sexual Assault on a Child by One in a Position of Trust and Sexual Assault.

56.  On or about October 4, 2018, Gould was interviewed by the Jefferson County Sherriff Office. Gould claimed during this interview that he was transferred to a different King Soopers store when he returned from a vacation in approximately April 2018. Gould claimed he was transferred because Chad Kennedy and another assistant manager asked that he be transferred.

57.  At some point following his first rape of Plaintiff, Gould informed a therapist of his relationship with Plaintiff but may not have disclosed Plaintiff's name or age. Upon information

9

and belief, Gould also discussed with this therapist his employment with Defendant and his transfer to another King Soopers store.

## FIRST CLAIMS FOR RELIEF - INDIVIDUAL RAPES
### (Vicarious Liability - Respondeat Superior)

58. Plaintiff hereby incorporates Paragraphs 1 – 54 above as though fully set forth herein.

59. As discussed more fully above, Gould's managerial duties involved creating employee work schedules which is a legitimate duty within the scope of Gould's employment.

60. During the time period discussed herein, the Plaintiff was raped 20 to 50 times. Therefore, the Plaintiff asserts a separate cause of action under this theory for each rape as *separate and distinct* wrongful events.

61. Gould, acting on behalf of and in his capacity as a manager for Defendant, scheduled the Plaintiff's shifts in a manner that isolated Plaintiff with Gould during her scheduled shifts at the Store and thereby left Plaintiff vulnerable to inappropriate workplace conduct and to sexual assault.

62. Gould used his power and authority as a manager of Defendant to create a situation which provided him opportunities to drive Plaintiff home following her shifts at the Store. In doing so, Gould served to accommodate the work schedules of the front end employees. This was a required and essential duty of Gould in his employment with Defendant in order to ensure adequate employee coverage at the front end of the Store, as necessary to the operation of the Store, and thus serving to benefit Defendant.

63. Gould's assaults on Plaintiff S.N. were conducted during such periods which were incidental to the legitimate work assigned to him; namely, creating the work schedule to ensure sufficient staffing for the Store. Gould *facilitated* Store staffing (and his depraved sexual behaviors) by personally driving the Plaintiff home subsequent to her shift.

64. Moreover, Gould's mixture of actions within the course and scope of his employment with patent criminal activity was both known and condoned, or at the very least willfully ignored, by *other* management employed by Defendant.

65. As such, Defendants conduct was attended by circumstances of fraud, malice and/or willful and wanton misconduct within the meaning of C.R.S. § 13-21-102

66. For these reasons, the Defendant is vicariously liable for the actions of its former manager, Gould, in an amount to be proven at trial for each of her rapes.

## SECOND CLAIM FOR RELIEF - INDIVIDUAL RAPES
### (Intentional Infliction of Emotional Distress - Outrageous Conduct)

67. Plaintiff hereby incorporates Paragraphs 1 – 63 above as though fully set forth herein.

68. During the time period discussed herein, the Plaintiff was raped 20 to 50 times. Therefore, the Plaintiff asserts a separate cause of action under this theory for each rape as *separate and distinct* wrongful events.

69. It is self-evident that the Defendant, through the actions and inactions of its managers, engaged in extreme and outrageous conduct.

70. Defendant, through the actions and inactions of its managers, was plainly in a position of authority over Plaintiff S.N. and controlled all aspects of her employment.

71. Defendant, through the actions and inactions of its managers, had actual knowledge that Plaintiff S.N., due to her young age and impressionable nature, was peculiarly susceptible to emotional distress. Moreover, as the abuse continued, she became even MORE susceptible to the emotional distress which her employment by Defendant enabled and/or caused.

72. The Defendant's conduct towards Plaintiff S.N., through the actions and inactions of management and as discussed above, is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and must be regarded as atrocious, and utterly intolerable in a civilized community.

73. The Defendant's conduct towards Plaintiff S.N., through the actions and inactions of management and as discussed above, was done with the specific intent to cause the Plaintiff severe emotional distress.

74. The Defendant's conduct towards the Plaintiff, through the actions and inactions of management and as discussed above, did in fact cause the Plaintiff severe emotional distress, the value of which will be proven at trial for each rape.

### **THIRD CLAIM FOR RELIEF - INDIVIDUAL RAPES**
**(Negligent Hiring, Training, Supervision and Retention)**

75. Plaintiff hereby incorporates Paragraphs 1 – 71 above as though fully set forth herein.

76. Conversely and pleaded only in the alternative, should Gould's conduct be deemed to be "outside the course and scope" of his employment, Defendant is liable to the Plaintiff for, among other things: failing to enforce company policy prohibiting fraternization between management and staff; failing to adequately investigate Gould prior to hiring; failing to adequately supervise Gould upon actual notice that he was abusing his power as a manager with respect to the Plaintiff; failing to properly supervise Gould upon actual notice that he was violating policies and procedures pertaining to fraternization and interaction with minors; failing to adequately train management as it pertains to the aforementioned policies and procedures; and, retaining Gould

upon actual notice that he had inappropriate sexual relationships with other young female employees which, upon information and belief, occurred prior to the incidents complained of herein.

77. Defendant owed Plaintiff S.N., a minor child and subordinate employee, a duty of care as to *at least* all items delineated in Paragraph 65, above, though Paragraph 65 is not in any way meant to be exclusive or exhaustive. That is, Defendant owed Plaintiff a duty to prevent her from being secluded, assaulted, and raped by an adult male employee, much less her manager, including a duty for Defendant to act upon its knowledge to provide Plaintiff a work environment which did not enable or create opportunity for an adult male management employee to commit these actions.

78. Defendant repeatedly breached *at least* each and every duty owed the Plaintiff as delineated in Paragraph 65, above.

79. During the time period discussed herein, the Plaintiff was raped 20 to 50 times. Therefore, the Plaintiff asserts a separate cause of action under this theory for each rape as *separate and distinct* wrongful events.

80. Gould's wrongful acts toward Plaintiff were so connected with his employment at the Store in time and place such that Defendant knew or should have known that harm may result from Gould's conduct. Defendant knew or should have known that Gould's conduct posed a foreseeable risk of harm to Plaintiff in particular—a minor child.

81. Defendant had the opportunity to control and/or prevent Gould's conduct in ways including, but not limited to: requiring alternative scheduling that did not place Gould and Plaintiff S.N. as the only front-end employees scheduled to work form 10:00 p.m. to 11:00 p.m.; investigating Gould's suspicious behavior in his scheduling of Plaintiff; and/or, by counseling, disciplining or warning Gould in any fashion regarding his inappropriate behavior toward Plaintiff—his subordinate and a minor child.

82. Defendant Dillon knew or should have known that Defendant Gould was engaging in conduct which was outrageous, negligent, and Defendant Dillon owed a duty of supervision of said Gould, to the public and to Plaintiff S.N., and breached said duty, causing the injuries and damages set forth above.

83. Defendant's failure to take reasonable steps to exercise control over Gould's conduct directly resulted in and contributed to Gould's continual sexual harassment, sexual assault and/or rapes of Plaintiff S.N.

84. As a direct and proximate cause of the aforementioned breaches by Defendant of its duties, the Plaintiff has suffered damages in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**(Civil Conspiracy)**

85. Plaintiff hereby incorporates Paragraphs 1 – 81 above as though fully set forth herein.

86. Defendant, through its employees and managers including but not limited to Gould, Ken Heck, Chad Kennedy, Eric Moden, and other unidentified employees and/or management of Defendant who ordered Gould transferred to another King Soopers store, (the "Conspirators") combined to engage in a civil conspiracy that was furthered by overt acts.

87. The Conspirators acted in concert to conceal from Plaintiff S.N., Plaintiff's fellow employees, the police and/or the public-at-large, generally and without limitation: (i) Defendant's complicity, knowledge and/or awareness of Gould's inappropriate workplace behavior toward Plaintiff and conduct toward Plaintiff including sexual harassment, sexual assault, or rape; and/or (ii) Gould's use of his authority and essential duties as manager to isolate Plaintiff in the workplace, engage in inappropriate workplace conduct with a minor child, and create the opportunity to commit crimes against Plaintiff (the "Conspiracy").

88. Defendant and its employee Conspirators agreed to and participated in the Conspiracy to act for the benefit of Defendant, including without limitation as to benefit Defendants' continued business operations and public relations. The Conspirators' only individual benefit from the Conspiracy was in their capacity as individual employees of Defendant.

89. The Conspirators committed overt acts in furtherance of the Conspiracy including but not limited to:

   a. Ken Heck stating to the Jefferson County Sheriff's Office that Gould was transferred to another King Soopers store due to performance issues including an unfriendly demeanor that Defendant's employee Chad Kennedy witnessed;
   b. Gould stating to the Jefferson County Sheriff's Office that he was transferred to another King Soopers store because Chad Kennedy and another manager did not like him;
   c. Defendant, through unclear employees/management, ordering Gould transferred to another King Soopers store after becoming aware of Gould's inappropriate and illegal conduct;
   d. Creating false documentation that failed to reflect the actual reasons for Defendant ordering Gould's transfer to another King Sooper's store;
   e. Refusing or neglecting to follow the terms of Defendant's Sexual Harassment Policy; and/or,
   f. Other acts designed to conceal from discovery by Defendant's employees and the general public the inappropriate and illegal behavior and actions of Gould in the workplace.

90. Defendant and its employee Conspirators, and each and every one of them, agreed and/or combined to engage in a civil conspiracy to commit the Conspiracy including the unlawful acts as described in this Complaint.

91.     Defendant and its employee Conspirators, and each and every one of them, combined to engage in the Conspiracy of which the principal element was to inflict wrongs against and/or injury on Plaintiff S.N. and the public-at-large as described in this Complaint.

92.     Defendant and its employee Conspirators, each and every one of them, understood, accepted, and/or explicitly and/or implicitly agreed to the general objectives of the schemes underlying the Conspiracy—to inflict the wrongs against and/or injury on Plaintiff S.N. and the public-at-large as described in this Complaint.

93.     Defendant and its employee Conspirators, each and every one of them, acquired, possessed, and maintained a general knowledge of the Conspiracy's objectives to inflict the wrongs against and/or injury on Plaintiff S.N. and the public-at-large as described in this Complaint.

94.     Defendant and its employee Conspirators, each and every one of them, combined to engage in the Conspiracy, a scheme that was intended to and did violate the law, and which concealed and secreted their schemes.

95.     Defendant and its employee Conspirators, each and every one of them, combined to engage in a scheme that was intended to violate the rights of Plaintiff S.N.

96.     Defendant and its employee Conspirators, each and every one of them, combined to engage in a scheme that was intended to violate the rights of the public-at-large.

97.     Defendant and its employee Conspirators are liable jointly and severally for all damages suffered by Plaintiff S.N. as a result of their conspiracy.

98.     In committing the acts described above, defendants acted with malice toward Plaintiff S.N. and the public-at-large, and Plaintiff is entitled to recover damages in such amount to be proven at trial as will sufficiently punish Defendant for its willful and malicious conduct and as will serve as an example to prevent a repetition of such conduct in the future.

### FIFTH CLAIM FOR RELIEF
**(Breach of Fiduciary Duty)**

99.     Plaintiff hereby incorporates Paragraphs 1 – 95 above as though fully set forth herein.

100.    Defendant, as Plaintiff S.N.'s and superior in control of all aspects of her employment, voluntarily undertook to act primarily for the benefit of its employees who are allegedly subject to sexual harassment in their employment with Defendant. Defendant described and memorialized its undertaking of this duty by publishing its Code of Business Ethics containing its Sexual Harassment Polity.

101.    Defendant's publication in its Sexual Harassment Policy of its policy and procedures for investigation and handling of alleged sexual harassment against employees caused Defendant to be in a position of trust in its employer-employee relationship with Plaintiff S.N. In particular,

Defendant was in a position of trust as to investigating and addressing Gould's sexual harassment of Plaintiff.

102. Defendant's Sexual Harassment Policy provided assurances to Defendant's inferior employees, including Plaintiff S.N., that such policies and procedures would be followed. This included Defendant proclaiming to Plaintiff that harassment "serious misconduct"; claiming to Plaintiff that "all claims of harassment will be investigated promptly and will be handled professionally and as confidentially as circumstances permit"; and claiming to Plaintiff that no reprisals or retaliation would take place against employees participating in an investigation of alleged harassment. *See* Ex. 1 at 15-17.

103. The language of Defendant's Sexual Harassment Policy is unequivocal in placing the interests of the employee allegedly subject to harassment above all other interests, and in Defendant thus acting for the benefit of said employee when following the Sexual Harassment Policy's stated policies and procedures. Defendant's Sexual Harassment Policy neither states nor establishes that Defendant will act in the interest or for the benefit of any employees apart from the employee allegedly subject to harassment. Defendant's Sexual Harassment Policy further does not state or establish Defendant will act to benefit the interests of Defendant itself while following its policies and procedures.

104. Defendant undertook the duty established by its Sexual Harassment Policy, according to its terms, at the time such alleged harassment became known to Defendant. That is, Defendant's awareness of any claimed sexual harassment of one of Defendant's employees triggered Defendant's duty to act for the best interests of the employee allegedly subject to harassment.

105. Defendant's Sexual Harassment Policy caused Defendant to be under a duty to act for S.N.'s benefit in investigating and handling any claimed sexual harassment against S.N. by Gould at the time Defendant first knew, or should have first known, of any harassment of S.N.

106. During the course of Gould's employment at the Store, Defendant knew and/or should have known that Gould engaged in inappropriate behavior toward Plaintiff S.N. in a manner which amounted to "sexual harassment" as defined in Defendant's Sexual Harassment Policy. Defendant knew or should have so known of Gould's conduct at a time prior to S.C. reporting Gould's behavior to Defendant's management in approximately May 2018, but certainly no later than when such reporting by S.C. took place.

107. Defendant acted in violation of this fiduciary duty by failing to act in the best interest of Plaintiff S.N. and/or acting in a manner contrary to S.N.'s best interest in ways including, but not limited to:

      a. Committing all tortious acts described in Counts I to V herein;
      b. Failing to perform an adequate investigation into the claimed sexual harassment of S.N. in accordance with the terms of Defendant's Sexual Harassment Policy;
      c. Failing to interview actual and/or potential witnesses to obtain more information;
      d. Failing to interview S.N. and/or S.C. to obtain more information;

e. Failing to report the results of its investigation internally;
f. Failing to treat Gould's words and actions as "serious misconduct";
g. Failing to report the results of its investigation to police authorities;
h. Failing to discipline Gould whatsoever;
i. Failing to create an investigative file as to Gould's words and actions;
j. Transferring Gould to work at another King Soopers location in the same or similar position upon S.C. reporting Gould's actions;
k. Failing to enact further discipline upon Gould following his transfer to another store on or about May 20, 2018 through Gould's arrest on or about October 4, 2018;
l. Continuing to employ and pay Gould wages and provide him benefits for approximately a minimum of five (5) months following S.C.'s reporting of Gould's conduct and Defendant's transfer of Gould to another location, all while Defendant failed to investigate Gould further;
m. Making false statements to police investigators about the reasons for Gould's transfer to another location and/or Defendant's knowledge of Gould's conduct;
n. Failing to provide S.N. a workplace free of harassment;
o. Investigating and handling Gould's known and/or reported words and actions toward S.N. in a manner that aimed to maximize Defendant's own benefit without regard to any detriment to S.N., S.C., its other employees or the public at large;
p. Engaging in reprisals and/or retaliation against S.C. multiple times following her reporting of Gould's behavior to Defendant's management by transferring S.C. to another store;
q. Acting in the interests of Gould and/or Defendant rather than in the interests of Plaintiff; and/or,
r. Willfully, knowingly, recklessly and/or negligently subjecting S.N. to unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of Gould which:
    i. Defendant, through its manager Gould, made either explicitly or implicitly a term or condition of S.N's employment,
    ii. Defendant, through its manager Gould, used as the basis for employment decisions affecting S.N. based upon her submission to or rejection of such conduct, and/or
    iii. had the purpose or effect of substantially interfering with S.N.'s work performance and/or creating an intimidating, hostile, or offensive working environment.

108. Defendant's failure to follow its own Sexual Harassment Policy caused Defendant to be in breach of its fiduciary duty to Plaintiff S.N.

109. Defendant's failure to follow its own Sexual Harassment Policy resulted in unnecessary delay in the commencement of the criminal investigation into Gould's behavior and conduct. If Defendant had investigated and handled Gould's known and/or reported words and actions toward Plaintiff S.N. in accordance with its Sexual Harassment Policy, the criminal investigation, charging, arrest and/or imprisonment of Gould would have occurred earlier in time.

110. Defendant's failure to follow its own Sexual Harassment Policy resulted in unnecessary danger to certain of Defendant's other employees and to the public at large. Defendant created such danger by maintaining the employment of Gould—whom an adequate investigation would have revealed to be a criminal sexual predator—in a trusted management position overseeing younger employees at different King Soopers location for approximately five (5) months following his transfer from the Store on or about May 20, 2018.

111. Plaintiff S.N. was damaged in amounts to be proven at trial as a direct and proximate result of Defendant's breach of its fiduciary duty to Plaintiff in ways including, but not limited to: Gould inflicting of mental and emotional stress upon S.N. and terrorizing her, as well as his repeated sexual harassment and rape of S.N. while Defendant employed Gould and S.N. at the Store after Defendant knew or should have known of Gould's conduct; Gould inflicting continued mental and emotional stress upon S.N. and terrorizing her through his intermittent interactions with S.N. following his transfer to another store but preceding his arrest; and/or Gould sexually harassing and raping S.N. following his transfer to another store but preceding his arrest.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully request that judgment be entered in favor of the Plaintiff and against the Defendant jointly and severally in an amount to fairly compensate her for the injuries as set forth above and for each separate and distinct instance of sexual abuse and violence, Court costs, attorney fees, expert witness fees, treble and/or other special damages per statute, statutory interest from the date this cause of action accrued or as otherwise permitted under Colorado law and for such other and further relief as this Court deems just and proper and/or Plaintiff prays for the following relief:

(a) For an amount which will reasonably compensate the Plaintiff for past, present and future economic loss for each separate and distinct instance of sexual abuse and violence;

(b) For an amount which will reasonably compensate the Plaintiff for past, present and future pain and suffering and all forms of noneconomic damages allowed by law and for each separate and distinct instance of sexual abuse and violence;

(c) For interest as provided by statute from the appropriate date to the date of verdict or judgment, and for costs and fees incurred in the prosecution of the matter and for any other and further relief as the Court may deem just and for each separate and distinct instance of sexual abuse and violence;

(d) For damages for permanent impairment and for each separate and distinct instance of sexual abuse and violence;

(e) Any damages allowed under any theory in law or equity available to the Plaintiff; and

(f) For such further relief as deemed appropriate.

**PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY**

**DATED** this 12th day of May, 2020.

        Respectfully Submitted,

        Law Office of Steve Roberts


        By: Steve Roberts
        100 Fillmore St. 5th Floor
        Denver, CO  80206
        Phone Number: 720-515-7058
        Fax Number: 303-484-2022
        sroberts@coloradorobertslaw.com
        Law Offices of John D. Halepaska


        By: John Halepaska
        John D. Halepaska, Atty. No. 28653
        600 17th Street, Suite 2800 South
        Denver, Colorado 80202
        Tel: 303-228-7179
        Fax: (303) 496-0194

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 12th day of May, 2020, a true and correct copy of the above and foregoing **PLAINTIFF'S FIRST AMENDED COMPLAINT** was served via CM/ECF, addressed to the following:

*Counsel for the Defendant*
Katie B. Johnson
Joseph E. Okon
Sutton | Booker | P.C
4949 S. Syracuse, Suite 500
Denver, Colorado 80237
Telephone:  303-730-6204
Facsimile:   303-730-6208
kjohnson@suttonbooker.com
jokon@suttonbooker.com

Co-Counsel for Plaintiffs
John D. Halepaska
Law Offices of John D. Halepaska, LLC
600 17th Street, Suite 2800 South
Denver, Colorado 80202
Phone: (303)228-7179
John@halepaskalaw.com

*s/ Steve Roberts*
_____
Steve Roberts
Law Office of Steve Roberts, LLC
100 Fillmore Street, 5th Floor
Denver, Colorado 80206